UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
UNITED STATES                   )
                                              )
   v.                                  )      CR No. 1:05-CR-10222-DPW
                                              )
DARNELL UPSHAW            )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT DARNELL UPSHAW'S MOTION TO
<u>SUPPRESS ALLEGED POST-ARREST STATEMENTS</u>**

       The government maintains that defendant Darnell Upshaw "confessed" following his arrest on August 26, 2005. The details of the purported "confession" are set forth in ATF Form, Report of Investigation, dated August 29, 2005, a copy of which is attached as Exh. A. ("ATF Rpt."). Regardless of whether Mr. Upshaw ever confessed,[1] all of the statements constituting the alleged "confession," must be suppressed for at least four independent reasons:

1. The alleged statements were made after Mr. Upshaw had asserted his right to counsel. Indeed, the alleged statements were made after Mr. Upshaw expressly informed the arresting agents that he had already retained counsel.

2. The alleged statements were made during custodial interrogation without adequate or appropriate *Miranda* warnings having been given. Many of the statements were made before any *Miranda* warnings had been given, and at no point were full and complete *Miranda* warnings issued.

3. Mr. Upshaw did not voluntarily, intelligently or knowingly waive his *Miranda* rights.

4. Mr. Upshaw was high on marijuana at the time he made the alleged statements. His drugged state as well as the coercive conditions under which the statements were made rendered the "confession" involuntary.

---

[1] Mr. Upshaw denies having made many, if not all, of the statements, summarized in the ATF Report, and he reserves his right to contest the truth and accuracy of those statements at trial. *See Jackson v. Denno,* 378 U.S. 368, 376 (1964).

## STATEMENT OF FACTS[2]

### A.   Mr. Upshaw Retains Counsel

Darnell Upshaw stands accused of having been a felon in possession of ammunition. His indictment was returned on August 24, 2005.

The day after the return of the indictment, a police officer contacted Mr. Upshaw and asked him to turn himself in. *See* Affidavit of Darnell Upshaw ("Upshaw Aff.") attached as Exh. B, at ¶ 2. In response to this request, Mr. Upshaw contacted Attorney Anthony Fugate, who in turn called the police on behalf of Mr. Upshaw. *Id*. at ¶ 3.

### B.   Mr. Upshaw's Drug Induced State

Mr. Upshaw, who just turned 24 years old, has smoked marijuana throughout his adult life. *Id*. at ¶ 4. August 25, 2005 was no different. If anything, Mr. Upshaw smoked more marijuana than usual on August 25, because the call from the police had made him nervous. *Id*. During the 24 hours between 7:00 a.m. on August 25 and 7:00 a.m. on August 26, 2005, Mr. Upshaw smoked at least eight or nine "blunts" of marijuana. *Id*. at ¶ 4.[3]

Mr. Upshaw did not sleep at all during the evening of August 25-26, 2005. *Id*. at ¶ 5. When law enforcement arrived to arrest him at approximately 7:00 a.m. on August 26, 2005, Mr. Upshaw was sleepless and extremely high on marijuana. *Id*. at ¶¶ 4-5. Indeed, Mr. Upshaw was so high that when he was first tested by law enforcement for drugs on September 8, 2005, more than two full weeks after his arrest, he still tested positive for marijuana even though he had not ingested any drugs since his arrest. *Id*. at ¶ 16.

---

[2]   The "facts" recited herein are only conceded for purposes of Mr. Upshaw's motion to suppress, and for no other purpose. Mr. Upshaw reserves the right to contest the "facts" at trial.

[3]   A "blunt" is a cigar that contains marijuana. *See, e.g., United States v. Rivera*, 152 F. Supp. 2d 61, 63 (D. Mass. 2001).

2

### C. Mr. Upshaw Is Arrested and Informs Law Enforcement That He Has An Attorney

Approximately ten law enforcement officers participated in Mr. Upshaw's arrest at 7:00 a.m. on August 26, 2005. *Id*. at ¶ 6; ATF Rpt. at ¶ 4. He was handcuffed and transported to the Framingham Police Department. ATF Rpt. at ¶ 4. He was not apprised of his *Miranda* rights at the time of his arrest or while in custody in Framingham. *Id*. at ¶ 4. He did, however, inform the arresting officers that he was represented by counsel. Upshaw Aff. at ¶ 7. After telling the officers that he had a lawyer, Mr. Upshaw did not initiate any further communications with law enforcement. *Id*.

### D. Mr. Upshaw Is Transported To Federal Court and Interrogated While On Route

Mr. Upshaw was not interrogated while in custody at the Framingham Police Station. *Id*. at ¶ 8. Nor was he given or even offered any food or water. *Id*. at ¶ 10.

Several hours after he was arrested and processed in Framingham, Mr. Upshaw was transported to federal court in Boston by law enforcement. *Id*. at ¶ 9. While being transported, with his hands handcuffed behind his back, federal agents initiated interrogation. *Id*. at ¶ 11. Despite the fact that Mr. Upshaw had previously made plain the fact that he had a lawyer, law enforcement started asking him questions. *Id*. at ¶¶ 7, 11. And they did so without apprising him of his *Miranda* rights. *Id*. at ¶ 12. They promised Mr. Upshaw leniency if he answered their questions, and he answered them, allegedly giving a "confession" in the process. *Id*. at ¶ 11; ATF Rpt. at ¶¶ 5-6.

At some point *after* law enforcement began questioning Mr. Upshaw and *after* he had made his supposed "confession," the interrogating officers gave Mr. Upshaw a partial *Miranda* warning, and then continued asking him questions. Upshaw Aff. at ¶ 12. At no time did Mr. Upshaw relinquish his right to counsel or waive any of his *Miranda* rights. *Id*. at ¶ 15.

3

## APPLICATION OF LAW TO FACTS

### A. Mr. Upshaw's "Confession" Must Be Suppressed Because It Was Obtained After He Had Asserted His Right To Counsel.

Once a defendant invokes his right to counsel he may not be interrogated by law enforcement until his counsel has been made available to him, unless the defendant himself initiates further communications. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Here, immediately following his arrest, Mr. Upshaw invoked his right to counsel. Upshaw Aff. at ¶ 7. He did so by alerting law enforcement to the fact that he had already retained counsel. *See*, *e.g.*, *United States v. Porter*, 764 F.2d 1, 6 (finding that defendant's telephone call to attorney in the presence of DEA officer invoked Defendant's right to counsel). From that point forward, any and all interrogation of Mr. Upshaw was rendered unlawful, at least until such time as his attorney was present or he voluntarily initiated further discussion. *Edwards*, 451 U.S. at 484-485. Neither occurred. Instead, hours after Mr. Upshaw's invocation of his right to counsel, but before counsel was present, ATF agents initiated further interrogation of him, during which he supposedly "confessed."[4] The remedy is suppression. *United States v. Gunning*, -- F. Supp. 2d. --, 2005 WL 3498286 at *3 (D. Mass. Dec. 13, 2005).

### B. Mr. Upshaw's "Confession" Must Be Suppressed Because It Was Obtained In Violation Of His *Miranda* Rights.

It is well settled that once a defendant is taken into custody, the police may not ask him any questions unless and until they first read him his complete *Miranda* rights. *Miranda v.*

---

[4] That the ATF agents who obtained the "confession" may not have heard Mr. Upshaw's invocation of his right to counsel is irrelevant. "Once a suspect has invoked the right to counsel, knowledge of that request is imparted to all law enforcement officers who subsequently deal with the suspect." *Porter*, 764 F.2d at 7; *United States v. Downing*, 665 F.2d 404, 407 (1st Cir. 1981) ("Law enforcement officers working in teams should be discouraged from violating the accused's constitutional right by failing to ascertain or advise one another whether those rights had been previously asserted"). Furthermore, that Mr. Upshaw may have answered the ATF agents' questions does not constitute a waiver of his prior invocation of his right to counsel. *See*, *e.g.*, *Edwards v. Arizona*, 451 U.S. at 484 (the mere fact that a defendant responds to improper "police-initiated custodial interrogation" does not constitute a waiver of a previously asserted right to counsel).

4

*Arizona*, 384 U.S. 436, 444 (1966) ("*prior to any questioning*" the defendant must be warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed") (emphasis added); *see also United States v. Teemer*, 260 F. Supp. 2d 187, 192 (D. Me. 2003) ("It is well established that *Miranda* warnings must be communicated to a suspect *before* he is subjected to 'custodial interrogation'") (emphasis added). Here, custodial interrogation of Mr. Upshaw began, and allegedly incriminating statements were elicited, *before* he received any *Miranda* warnings. Upshaw Aff. at ¶ 12. And when the questioning ATF agents read Mr. Upshaw his rights, they did not read all of them. *Id*. Tellingly (given the fact that Mr. Upshaw had previously invoked his right to counsel), the agents omitted any reference to Mr. Upshaw's right to counsel. *Id*. In light of the interrogating agents' timing and completeness failures with respect to the recitation of Mr. Upshaw's *Miranda* rights, all in-custody statements made by Mr. Upshaw in response to interrogation -- including all statements made before and after he received partial *Miranda* warnings -- must be suppressed. *See Miranda*, 384 U.S. at 467-473; *United States v. Faulkingham*, 295 F.3d 85, 90 (1st Cir. 2002); *United States v. Veilleux*, 846 F. Supp. 149, 155 (D.N.H. 1994).

    **C.**    **Mr. Upshaw's "Confession" Must Be Suppressed Because He Never Waived His *Miranda* Rights.**

Even if the interrogating agents had informed Mr. Upshaw of all of his *Miranda* rights before they commenced their custodial interrogation (which they did not), the alleged answers given by Mr. Upshaw would still have to be suppressed because he did not affirmatively or voluntarily waive his rights. Merely, reciting *Miranda* rights to an accused, or even obtaining assurance that an accused understands his rights, does not suffice. As the First Circuit has explained:

5

> Merely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. *Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them.

*Porter* 764 F.2d at 7 (granting motion to suppress where there was no waiver of defendant's right to an attorney). *See also United States v. Rodriguez*, 931 F. Supp. 907, 924 (D. Mass. 1996) (granting motion to suppress where defendant answered officer's question about the firearms as he was being placed in the police cruiser, but the court found no evidence to support a knowing and intelligent abandonment of the right to remain silent). Here, there was no *Miranda* waiver whatsoever, let alone a voluntarily one. Upshaw Aff. at ¶ 15.[5] Suppression is, therefore, required. *Rodriguez*, 931 F. Supp. at 924; *United States v. Lynch*, 813 F. Supp. 911, 917-919 (D.N.H. 1993).

### D. Mr. Upshaw's "Confession" Must Be Suppressed Because It Was Given Involuntarily.

Regardless of whether Mr. Upshaw was properly warned of or validly waived his *Miranda* rights (neither of which occurred), his alleged post-arrest statements would have to be suppressed because they were made involuntarily. *Veilleux*, 846 F. Supp. at 154-155; *United States v. Cellemme*, 431 F. Supp. 731, 734-735 (D. Mass. 1977). At least the following establish that under the totality of the circumstances, Mr. Upshaw's post-arrest statements were not made voluntarily:

- *Drug Intoxication* -- Mr. Upshaw was high on marijuana at the time of his arrest and interrogation. Upshaw Aff. at ¶¶ 4, 13. "While statements made under the influence of drugs may not per se be involuntary, at some point the degree of intoxication may prohibit one from acting rationally or voluntarily." *Cellemme*, 431 F. Supp. at 734. Here, that degree of intoxication was reached.

---

[5] That Mr. Upshaw may have answered questions put to him does not in and of itself constitute a waiver of his Miranda rights. *Miranda*, 384 U.S. at 475-476.

6

- *Coercive Context of Interrogation* -- Mr. Upshaw's alleged "confession" was made while he was handcuffed behind his back in the back of a government cruiser, and after a sleepless, marijuana-smoking night and an early morning arrest by approximately ten law enforcement officers. Upshaw Aff. at ¶¶ 4-11.  These conditions constituted an unnecessarily coercive environment.  *See e.g., Miranda*, 384 U.S. at 457-458; *Cellemme*, 431 F. Supp. at 734.

- *False Promises Made By Interrogating Agents* -- Mr. Upshaw was induced to answer the interrogating agents' questions by their promising him leniency if he were to cooperate.  Upshaw Aff. at ¶ 11.  *See*, *e.g.*, *Brady v. United States,* 397 U.S. 742, 754 (1970) (noting that for an unrepresented defendant "even a mild promise of leniency "may be" sufficient to bar the confession, not because the promise [is] an illegal act as such, but because the defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess"); *Veilleux*, 846 F. Supp. at 155 (granting motion to suppress where defendant "was in fact induced, by the misrepresentations as to his rights and by the promises" made by the police).

Although none of these occurrences in and of itself may have been sufficient to render Mr. Upshaw's post-arrest statements involuntary, the combination of all of them was more than adequate.  The remedy must be suppression.  *Veilleux*, 864 F. Supp. at 154-155; *Cellemme*, 431 F. Supp. at 734-735.

## **CONCLUSION**

There can be no dispute that Mr. Upshaw's alleged "confession" was made in response to custodial interrogation.  ATF Rpt. at ¶¶ 4-5.  That interrogation, initiated by government agents, took place after Mr. Upshaw had invoked his right to counsel, but without counsel present.  Furthermore, the interrogation occurred without proper *Miranda* warnings having been given, and without the requisite waiver by Mr. Upshaw of his *Miranda* rights.  In addition, the totality of the circumstances under which the "confession" was allegedly made and received established that it was involuntary.  For all of these reasons, Mr. Upshaw's "confession" must be suppressed.

7

Respectfully Submitted,

DARNELL UPSHAW
By his attorneys,

/s/ David J. Apfel
David J. Apfel, Esq.
Anita B. Bapooji Ryan, Esq.
GOODWIN PROCTER, LIP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231

Date: January 23, 2006

## CERTIFICATE OF SERVICE

I, David Apfel, attorney for the Defendant Darnell Upshaw, do hereby certify that I caused a copy of this memorandum to be served upon Cynthia Lie, Assistant U.S. Attorney, via ECF on January 23, 2006.

/s/ David J. Apfel
David J. Apfel

LIBA/1668262.1

DEPARTMENT OF JUSTICE
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
**REPORT OF INVESTIGATION**

Page 1 of 4

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge | Boston Field Division |
| Boston Field Division | FY-05 |
| | Report 013 |

**TITLE OF INVESTIGATION:** ███████

**CASE NUMBER:** ███████

**REPORT NUMBER:** 13

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY (Name) | SUBMITTED BY (Title and Office) | SUBMITTED BY (Date) |
|---|---|---|
| Robert J. White | Special Agent, Boston IV Field Office | 08/29/2005 |
| REVIEWED BY (Name) | REVIEWED BY (Title and Office) | REVIEWED BY (Date) |
| Kenneth J. Croke | Group Supervisor, Boston IV Field Office | |
| APPROVED BY (Name) | APPROVED BY (Title and Office) | APPROVED BY (Date) |
| William J. Hoover | Special Agent in Charge, Boston Field Division | |

**DESCRIPTION OF ACTIVITY:**
Execution of federal arrest warrant for Darnell UPSHAW.

**SYNOPSIS:**
On August 26, 2005, ATF and Framingham Police executed the federal arrest warrant for Darnell UPSHAW at 32C Interfaith Terrace, Framingham, MA.

**NARRATIVE:**

1. On August 26, 2005, at approximately 7:00 am, ATF and Framingham Police executed the federal arrest warrant for Darnell UPSHAW at 32C Interfaith Terrace, Framingham, MA.

2. On August 25, 2005, S/A Pijaca had spoken to UPSHAW via telephone (774-222-0734). The number was provided to ATF by Douglas Upshaw, the father of Darnell UPSHAW. S/A Pijaca informed UPSHAW that there was a federal arrest warrant issued for his arrest. UPSHAW informed S/A Pijaca that he was in Boston, MA and going to turn himself in at the Brockton Police Station that morning. UPSHAW never arrived.

3. On August 26, 2005, at approximately 3:30 am, S/A White received information that FBI had received an anonymous tip stating the UPSHAW was hiding at 32C Interfaith Terrace, Framingham, MA with Daniel Eisenberg. S/A White contacted the Framingham Police Department. A check of their in-house computer system revealed that Daniel Eisenberg did reside at 32C

| DEPARTMENT OF JUSTICE<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES<br>REPORT OF INVESTIGATION | Page 2 of 4 |
|---|---|
| **ADDRESSED TO:**<br>Special Agent in Charge<br>Boston Field Division | **MONITORED INVESTIGATION INFORMATION:**<br>Boston Field Division<br>FY-05<br>Report 013 |
| **TITLE OF INVESTIGATION:** | |
| **CASE NUMBER:** | **REPORT NUMBER:**<br>13 |

Interfaith Terrace, Framingham, MA. Framingham detectives observed a vehicle registered to Douglas Upshaw in the area of this address.

4. Framingham Police officers surrounded the residence and eventually made contact with UPSHAW placing him under arrest. Framingham Police officers also encountered Daniel Eisenberg DOB: 3/6/84 and Jamal Ashton Kayvon DOB: 8/17/85 inside of the residence. UPSHAW was transported to the Framingham Police station. Daniel Eisenberg signed a voluntary consent to search form. No firearms or ammunition were observed in the residence.

5. S/A White, in the presence of S/A Schafer read UPSHAW his Miranda rights which he stated he understood. S/A White informed UPSHAW that he was being charged with being a felon in possession of ammunition. UPSHAW stated that he knew why he was being arrested to S/A Schafer. UPSHAW stated to S/A White and S/A Schafer that a black male (CI-███) pulled up in front of his house looking to obtain ammunition and he gave it to him. UPSHAW stated that he recognized this individual from the previous day at the "Pet Co. plaza" and seeing him several times before. UPSHAW stated that he had been a passenger in a vehicle with Jermaine POLITANO and Justice AINOOSON the previous day at the "Pet Co. plaza." UPSHAW stated that POLITANO and AINOOSON exited the vehicle with a bag, spoke with CI-███ in his vehicle and returned. UPSHAW stated that POLITANO informed him that CI-███ wanted something the following day, concerning the meet that had just taken place. UPSHAW did not say what POLITANO was referring to, but further stated that POLITANO dropped off a box of ammunition following day to his residence on Farrington Street.

6. UPSHAW further described the ammunition he gave to CI-███ UPSHAW stated that POLITANO came by his residence and placed a box of ammunition in the second floor hallway. UPSHAW stated that he was in front of his residence with Mark LNU working on a vehicle when CI-███ arrived. UPSHAW stated that he went to the second floor hallway obtained the ammunition and placed it into a plastic bag. UPSHAW stated he then gave the ammunition to CI-███

7. UPSHAW began to describe individuals involved with firearms in Brockton and Boston, MA. UPSHAW stated that Kevin Lewis and Joseph Politano had access to firearms. UPSHAW stated that Kevin Lewis had a shotgun and .44 caliber revolver. UPSHAW further stated that Jermaine POLITANO "always has a gun." UPSHAW stated that an individual named Howie LNU had informed him that he was attempting to sell "new guns," a .40 caliber pistol for $1200.00. UPSHAW described Howie LNU as Jamaican, black male, 5'6", medium build,

| DEPARTMENT OF JUSTICE<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES<br>REPORT OF INVESTIGATION | Page 3 of 4 |
|---|---|

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-05<br>Report 013 |
|---|---|
| **TITLE OF INVESTIGATION:**<br>~~JERMAINE N. ~~ | |
| **CASE NUMBER:**<br>~~~~ | **REPORT NUMBER:**<br>13 |

driving a blue Nissan Maxima, living off Dorchester Street by Ashmont Street in Boston, MA.

8. UPSHAW discussed several shooting that had taken place in Brockton, MA. UPSHAW stated that Keith Wade, his cousin, was shot in December or January during the last winter, on Westin Street in Brockton, MA. UPSHAW stated that he had recently arrived at his cousins and people began shooting. UPSHAW stated that the shooting was in retaliation to an individual that was robbed by his cousin Keith Wade. UPSHAW stated that the shooting came from a white car and was done by Ralph LNU. UPSHAW described Ralph LNU as Haitian. Detective Delehoy informed S/A White that Ralph LNU is possibly Ralph Tousaint.

9. UPSHAW discussed the shooting of Marcus Norris, on Farrington Street, Brockton, MA. UPSHAW stated that this shooting took place in March of 2005. UPSHAW stated that he had gotten in a fight with CJ LNU on Farrington Street. CJ LNU returned with several individuals to confront UPSHAW. UPSHAW stated that CJ LNU pulled out a firearm and Marcus Norris punched CJ LNU. CJ LNU dropped the firearm during the altercation. UPSHAW stated that Jamiel LNU "animal" picked up the firearm and shot Marcus Norris. UPSHAW stated that he then fled the area and hid in the hallway of 47 Farrington Street.

10. UPSHAW also discussed the murder of John Falcone, an individual from Hanson, MA that had taken place on Farrington Street, Brockton, MA. UPSHAW stated that John Falcone was shot during a drug deal. UPSHAW stated that he was in his father's bedroom at 30 Farrington Street, Brockton, MA when he heard several gunshots. UPSHAW stated that he looked out a large window to the rear of this address and observed Lewis FRANKLIN with a firearm in his hand. UPSHAW stated that he recognized FRANKLIN from his neighborhood. UPSHAW stated that FRANKLIN was moving his arm in a motion that appeared to be firing the handgun. UPSHAW stated that he could only see FRANKLIN and not whom he was shooting at. UPSHAW watched as FRANKLIN ran behind a garage where he lost sight of him. UPSHAW knew that FRANKLIN would have to jump a fence behind the garage and attempted to move to the kitchen window of 30 Farrington, Street. UPSHAW stated that from the kitchen window he was unable to see FRANKLIN any longer.

11. S/A White contacted Brockton Police Department and learned that Detective Ernie Bell and MSP Trooper Ruben Colon were actively working the

| DEPARTMENT OF JUSTICE<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES<br>REPORT OF INVESTIGATION | Page 4 of 4 |
|---|---|

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-05<br>Report 013 |
|---|---|
| TITLE OF INVESTIGATION:<br>███████ | |
| CASE NUMBER:<br>███████ | REPORT NUMBER:<br>13 |

homicide of John Falcone. S/A White relayed this information to these investigators.

ATTACHMENTS:

Framingham Police Department Booking Report for UPSHAW

Framingham Police Department consent to search residence of Danielle Eisenberg

ATF EF 3120.2 (5-98)

0000000030

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.   )<br>)<br>DARNELL UPSHAW  )<br>) | CR No. 1:05-CR-10222-DPW |

### AFFIDAVIT OF DEFENDANT DARNELL UPSHAW IN SUPPORT OF MOTION TO SUPPRESS ALLEGED POST-ARREST STATEMENTS

I, DARNELL UPSHAW, do hereby depose and say as follows:

1. I am the defendant in the above-referenced matter.

2. On August 25, 2005, I was contacted by a police officer, was told that there was a federal warrant for my arrest and was asked to turn myself in.

3. When I found out that there was a federal warrant for my arrest, I got in touch with an attorney, Anthony Fugate, to represent me. Attorney Fugate then contacted the Brockton police, on my behalf, to ask about the federal arrest warrant.

4. Since the age of approximately 14, I have been a regular user of marijuana. August 25, 2005 and the early morning of August 26, 2005 were no different. If anything I smoked more marijuana than usual on August 25-26, because I was anxious and nervous. Between 7:00 a.m. on August 25, and 7:00 a.m. on August 26, I smoked at least eight or nine blunts of marijuana.

5. I got no sleep the night of August 25-26, 2005.

6. Early in the morning on August 26, 2005, approximately ten (10) police officers entered the house where I was staying. I was handcuffed and placed under arrest. I had not slept and was very high on marijuana at the time.

7.  Right after I was arrested, I told the arresting officers that I had a lawyer. I did not initiate any further communications with any of the officers.

8.  I was taken to the Framingham Police station by several officers and placed in a cell by several officers. I was not informed of any of my rights while I was at the Framingham Police station. I don't recall exactly how long I stayed in the cell in Framingham, but it was awhile. I was not interrogated while I was at the Framingham Police station.

9.  I was then placed into the back seat of a police car with my hands handcuffed behind my back and transported by two government agents to the federal courthouse in Boston.

10. Between the time of my arrest and my arrival in Boston, I was not offered nor did I receive, anything to eat or drink.

11. While in the cruiser on the way to Boston, the agents started asking me questions, and one of the agents promised me that he'd help me out if I cooperated. I didn't initiate any discussion with the agents. They were the ones asking all the questions.

12. Before the agents started asking me questions, they did not tell me anything about any of my rights. At some point during the drive to Boston, after the agents had already been asking me questions for awhile, one of them told me I had a right to remain silent and that anything I said could be used against me. After telling me this, the agents resumed their questioning.

13. I was high and felt under a lot of pressure the whole time I was answering the agents' questions.

14. At no time did I acknowledge that I understood my rights, nor did I ever sign any form acknowledging that I understood my rights.

15. At no time was I provided with a written waiver form regarding rights, nor was I asked if I wanted to waive any of my rights. I never agreed to waive any of my rights.

16. Between the time of my arrest on August 26, 2005 and September 8, 2005, I smoked no marijuana and used no illegal drugs. On September 8, 2005, I took the first drug test I had taken since my arrest. That test came back positive for marijuana.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23rd DAY OF JANUARY 2006.

*Darnell Upshaw*
Darnell Upshaw

LIBA/1667547.1